## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 23-cv-21275-BLOOM/Torres

EDDY J. PHILIPPEAUX,

      Plaintiff,

v.

MIAMI APARTMENTS INVESTORS, LLC,
*et al.*,

      Defendants.

_____/

### <u>OMNIBUS ORDER ON MOTIONS FOR SUMMARY JUDGMENT</u>

**THIS CAUSE** is before the Court upon Defendants Miami Apartment Investors, LLC, Baron Residential Management, and Sharon Fothergill's (collectively, "Defendants") Motion for Summary Judgment, ECF No. [58] ("Defendants' Motion"). *Pro se* Plaintiff Eddie J. Philippeaux filed a Cross-Motion for Summary Judgment and Opposition to Defendants' Motion for Summary Judgment, ECF No. [59] ("Plaintiff's Motion"), to which Defendants filed a Reply, ECF No. [62]. The Court has reviewed the Motions, all supporting and opposing submissions,[1] the record in this case, the applicable law, and is otherwise fully advised. For the reasons set forth below, Defendants' Motion is granted, and Plaintiff's Motion is denied.

---

[1] Defendants filed a Statement of Material Facts ("DSMF") with their Motion, ECF No. [58-2]. Plaintiff filed an Affidavit Accompanying Plaintiff's Statement of Material Facts in Support of His Cross-Motion for Summary Judgment and in Opposition to Defendants' Motion, ECF No. [60]. As Defendants observe, Plaintiff's "Affidavit" fails to cite to the record. Because Plaintiff is a *pro se* litigant, the Court nonetheless construes Plaintiff's filing as a statement of material facts in support of his Motion. The Court accordingly refers to ECF No. [60] as "PSMF".

## I.  BACKGROUND

### A.  Procedural History

On April 4, 2023, Plaintiff filed his *pro se* Complaint alleging three causes of action. ECF No. [1]. Plaintiff alleges that Defendants retaliated against him by evicting him, in violation of the Americans with Disabilities Act ("ADA") (Count I); Defendants retaliated against him by evicting him, in violation of the Fair Housing Act ("FHA") (Count II); and Defendants conspired to retaliate against him, in violation of Plaintiff's civil rights in violation of 42 U.S.C. §§ 1981 and 1985 (Count III). *See generally id*.

On May 5, 2023, Defendants filed a motion to dismiss Counts I and III, ECF No. [21], which the Court granted in part and denied in part, ECF No. [35]. In its Order, the Court dismissed Count I with prejudice and dismissed Count III without prejudice, permitting Plaintiff to file an Amended Complaint by July 5, 2023. *Id*.

Plaintiff timely filed an Amended Complaint. ECF No. [37]. Therein, Plaintiff alleges five causes of action: Retaliation in Violation of the ADA (Count I); Retaliation in Violation of the FHA (Count II); Civil Rights Violations pursuant to 42 U.S.C. §§ 1981 and 1985 (Count III); Intentional Infliction of Emotional Distress (Count IV); and Negligent Infliction of Emotional Distress (Count V). *See generally id*.

On July 10, 2023, Defendants filed a motion to dismiss Plaintiff's Amended Complaint, ECF No. [42], which the Court granted in part and denied in part, ECF No. [46]. The Court's Order dismissed Counts I, III, IV, and V with prejudice but denied Defendants' motion to dismiss with respect to Count II. Defendant now moves for summary judgment on the Plaintiff's remaining claim of retaliation in violation of the FHA, Count II.

### B.  Material Facts

Based on the Parties' briefings and the evidence in the record, the following facts are not genuinely in dispute unless otherwise noted.

### i.   Plaintiff's Previous Lawsuit

This is not the first lawsuit Plaintiff has filed against Defendants. Plaintiff was a tenant for five years at Monarc at Met ("Monarc"), located at 201 SE 2nd Avenue, Miami, FL 33131. DSMF ¶ 1; PSMF ¶ 7. Plaintiff signed his most recent lease on August 17, 2021. ECF No. [58-10] at 39. Before the instant case, Plaintiff filed a lawsuit against the same Defendants on August 16, 2021 in the U.S. District Court for the Southern District of Florida, styled *Philippeaux v. Miami Apartments Investors, LLC et al.*, Case No. 21-cv-22981-PCH (the "Lawsuit"). Plaintiff's complaint in the Lawsuit asserted six causes of action against Defendants:[2] FHA disability discrimination (Count I); violation of the Americans with Disabilities Act ("ADA"), 41 U.S.C. §§ 12101 *et seq.* (Count II); FHA and ADA disability discrimination based on disparate impact (Count III); fraudulent inducement (Count IV); breach of contract (Count V); and FHA and ADA retaliation (Count VI). *See generally Philippeaux*, 21-cv-22981-PCH, ECF No. [73]. There, the court granted the defendants' motions to dismiss Plaintiff's complaint with prejudice as a shotgun pleading on May 12, 2022.[3] DSMF ¶ 37; *see id.*, ECF No. [86] at 3. Plaintiff filed his appeal on May 16, 2022. *Id.*, ECF No. [87]. The Eleventh Circuit affirmed the dismissal of Plaintiff's Lawsuit on May 17, 2023, while this case was pending. *Id.*, ECF No. [101].

---

[2] Plaintiff also named ZRS Management, Rivergate KW Management, LLC, SP Plus Corporation and Nadia Fernandez as defendants. *See generally Philippeaux*, 21-cv-22981-PCH, ECF No. [73].

[3] The court's order noted "[a]s best the [c]ourt can infer, the primary issue underlying the [complaint] seems to be that one or more Defendants did not assign to Plaintiff a parking space on the second floor, as opposed to one on a higher level, in his apartment parking garage." *Philippeaux*, 21-cv-22981-PCH, ECF No. [86] at 3.

### ii. October 2021: Incidents Before Defendants' November Letter

Defendant Sharon Fothergill ("Fothergill") served as the Senior Community Manager at Monarc from December 2, 2019 – December 21, 2022. PSMF ¶ 3. Plaintiff testified that he met with Fothergill on multiple occasions while he was a tenant at Monarc. ECF No. [67] at 54-55. Plaintiff explained he would meet with Fothergill when he "had a major issue that needed to be resolved right away." *Id.* at 58. One of those occasions occurred in October 2021, when Fothergill was in Assistant Manager Linette Gonzalez's office with another co-worker, Senior Regional Manger Wellington Gomez. ECF No. [58-5] ¶ 5 ("Fothergill Declaration"). Fothergill recalls Plaintiff coming up to the office door and "banging on the glass[,]" which gradually became "louder and more persistent." *Id.* ¶ 6. Fothergill opened the office door and informed Plaintiff the office was closed, at which point Plaintiff "spoke loudly to [Fothergill], which made [her] feel belittled." *Id.* ¶ 7. Fothergill noted that when Gomez "approached the door, [Plaintiff] did not raise his voice." *Id.* ¶ 8. Fothergill added that she "never heard [Plaintiff] raise his voice to Mr. Gomez[,]" which made her feel Plaintiff "treated [her] in a misogynistic way because he spoke differently to Mr. Gomez on this and other occasions." *Id.* ¶¶ 7-8.

Plaintiff testified that he does not recall that event. ECF No. [67] at 46. However, Plaintiff conceded he "knock[ed] on the glass door" of the leasing office during his tenancy, although he testified there is "nothing at all aggressive about knocking on the glass . . . to let somebody know that you are trying to get their attention[.]" *Id.*; *see also* PSMF ¶ 61 (noting "the glass panel[ed] doors located in the leasing office . . . may require a harder knock if you need to speak to an agent in the leasing office about your needs or problems.").

Fothergill testified that she was also "receiving multiple complaints from other residents . . . [a]round this same timeframe" regarding Plaintiff "loitering in the lobby at Monarc." *Id.* ¶ 10.

Fothergill "had a good faith belief that the complaints [she] received from these other tenants were true." *Id.* ¶ 11. "Because of the way [Plaintiff] made [Fothergill] feel during our interactions and the resident complaints [Fothergill] received, [Fothergill] asked Mr. Gomez if [Defendants] could send a letter to [Plaintiff]." *Id.* ¶ 12. Defendants thereafter sent Plaintiff a letter signed by Defendants' attorney, Stephanie Vo, memorializing Defendants' concerns on November 1, 2021. ECF No. [58-6] ("November Letter"). The November Letter states:

> Dear Mr. Philippeaux,
>
> This letter is written on behalf of Baron Residential Management concerning your behavior towards their management team and, specifically, the Senior Community Manager, Sharon Fothergill. It has been noted that you have approached Ms. Fothergill on numerous occasions in a harassing, argumentative, and aggressive manner, including physically banging on the glass walls of the leasing office.
>
> Baron Residential Management does not tolerate such conduct towards anyone on the premises. Accordingly, from this date forward, you are instructed to cease all communication with Ms. Fothergill and, instead, communicate only with Mr. Wellington Gomez of Residential Management should you need to discuss anything related to your residency at the Monarc at Met.
>
> Additionally, we have received complaints from several residents that your presence at the Concierge desk is disruptive and intrusive. We remind you that loitering at and about the Concierge desk is prohibited. You may utilize the lobby area as needed; however, residents are not allowed to congregate or loiter at the Concierge desk as it affects their ability to function.
>
> Lastly, we remind you that visits to the management office are by appointment only. Due to the Covid-19 pandemic, we must take such precautions for the safety of everyone. Therefore, please contact Mr. Gomez to make an appointment if and when you need to visit the management office.
>
> We thank you in advance for your cooperation and Mr. Gomez remains available to address any issue you might have. For your convenience, his direct contact information is below:
>
> Wellington Gomez
> Senior Regional Manager
> Monarc at Met
> Office: (786) 814-8411

wgomez@baronres.com

*Id.*

Plaintiff testified that he did not believe the November Letter concerned his conduct toward Fothergill, and he did not discuss the November Letter with Fothergill or any other Monarc employee. ECF No. [67] at 44, 48-49. Plaintiff viewed the November Letter "as nothing but another form of retaliatory harassment[.]" *Id.* at 60. However, Plaintiff testified that he recalled "one other tenant that . . . had some kind of complaint about me not wearing a mask or something[.]" *Id.* at 53-54. Plaintiff later described a similar altercation where "a tenant had called the police . . . while I was in the lobby because I was not wearing my mask[,]" *id.* at 78, but it is unclear if those are two separate incidents. Plaintiff explains he "did not wear a mask during covid-19 because of his medical conditions[,]" and that he "suffers from shortness of breath, nervousness, heart palpitation[s] and panic attack[s]." PSMF ¶ 39.

### iii. November 2021 – February 2022: Incidents Before the March Letter

After sending the November Letter, Fothergill "received additional complaints from a tenant named Sukaina Jaafar, who had a 15-year old daughter." ECF No. [58-5] ¶ 14. "Ms. Jaafar told [Fothergill] that when [Plaintiff] was loitering in the lobby on multiple occasions, he looked at [Ms. Jaafar's] daughter in a way that made her feel uncomfortable." *Id.* Fothergill "had a good faith belief that these additional complaints were true[,]" which prompted Fothergill to "later ask[] Mr. Gomez if [Defendants] could send a second letter to [Plaintiff]." *Id.* ¶¶ 15-16. Defendants sent Plaintiff a second letter detailing these issues on March 1, 2022. ECF No. [58-7] ("March Letter"). The March Letter stated:

Dear Mr. Philippeaux,

This letter is written on behalf of Baron Residential Management. Since our prior correspondence of November 2, 2021, we have continued to receive

complaints from several residents and our front desk staff concerning your prolonged presence and conduct at the Concierge.

We direct you to Paragraph 21 of your Apartment Lease Contract, which is attached for your reference and states in pertinent part:

> **PROHIBITED CONDUCT**. You, your occupants or guests, or the guests of any occupants, may not engage in the following activities: behaving in a loud or obnoxious manner; disturbing or threatening the rights, comfort, health, safety, or convenience of others (including our agents and employees) in or near the apartment community; disrupting our business operations; … You agree to communicate and conduct yourself at all times in a lawful, courteous, and reasonable manner when interacting with our employees, agents, independent contractors, and vendors; other residents, occupants, guests or invitees; or any other person on the premises. You agree not to engage in any abusive behavior, either verbal or physical, or any form of intimidation or aggression directed at our employees, agents, independent contractors, and vendors; other residents, occupants, guests or invitees; or any other person on the premises…Any violation of this paragraph shall be a material breach of this Lease and will entitle us to exercise all rights and remedies under the lease and law.

This letter is a final request for you to comply with the above terms of your lease. Specifically, you are prohibited from loitering at the Concierge desk, interfering with our staff, and interjecting yourself into the conversations between staff and other residents. You may use the lobby area as needed; however, residents are not allowed to congregate or loiter at the Concierge desk as it affects their ability to function. If your disruptive behavior continues, we will have no recourse but to seek termination of your lease.

We thank you in advance for your cooperation and Mr. Gomez remains available to address any issue you might have.

*Id.*

Plaintiff testified that he was unaware other tenants made complaints about his conduct during this period. ECF No. [67] at 80. Plaintiff also testified that he does not recall if he attempted to discuss the March Letter with Gomez. *Id.* at 70-71. However, Plaintiff acknowledged there "may have one or two persons who may have said something about, about me being in the lobby more

frequently than [other residents] would like[,]" although he also noted such persons "might have some issue, a bias toward [him]." *Id.* at 77-78.

Plaintiff testified that he finds Fothergill to be "a very aggressive person, who appears to be snooping in other people's affairs." PSMF ¶ 41. Plaintiff describes a situation that occurred "[a]fter the lawsuit was filed" between himself and Fothergill. *Id.* ¶ 43. Plaintiff explains he "was in the leasing office taking care of apartment business with one of her employee[s]," which prompted Fothergill to "immediately summon[]" the employee into her office and direct that employee to "**tell [Plaintiff] to get out of the leasing office right now**." *Id.* ¶ 43 (emphasis in original).

### iv.  August 2022: Defendants' Non-Renewal of Plaintiff's Lease

Defendants did not renew Plaintiff's lease in August 2022. DSMF ¶ 38. Fothergill testified that Defendants made the decision not to renew Plaintiff's lease "[b]ecause of the multiple resident complaints and the way [Plaintiff's] conduct made [Fothergill] feel." ECF No. [58-5] ¶ 18. Defendants sent Plaintiff a Notice of Non-Renewal of Lease Agreement on August 3, 2022. ECF No. [58-8] (the "Notice of Non-Renewal"). Plaintiff testified that he does not recall discussing the Notice of Non-Renewal with anyone at Monarc. ECF No. [67] at 86.

Plaintiff testified that he believes the November Letter and March Letter (collectively, the "Letters") are "fictitious" and "do not reflect anything at all that was happening at Monarc." *Id.* at 69; *see also* PSMF ¶ 12 ("The Defendants appear to [have] construct[ed] letters to create a defense against Mr. Philippeaux's lawsuit."). Plaintiff also testified that he believes Defendants decided not to renew his lease because of the Lawsuit:

> Q. Okay So is it your belief that your lease was not renewed because of that litigation?

A. Ma'am, like I said – Not belief. I know that for a fact. No doubt at all in my mind about it. If I had not filed – If I had not filed a district – U.S. District Court action, I still – right now would still be living at Monarc.

Q. Okay.

. . .

Q. And, and, again, Mr. Philippeaux, why do you believe that that's the case?

A. Because it is the case. Because every one of those letters that you have shown me was manufactured, created once I had filed my U.S. District Court action. They were created in a very short period of time after I filed my District Court action. I mean, within, like a – within, like, a matter of months or weeks these letters were created . . . . Because right now we're talking about a second lawsuit, which is retaliation . . . that is yielded or comes from the previous lawsuit, and the previous lawsuit is, is the basis for the retaliation.
. . .

ECF No. [67] at 90-92.

Plaintiff's Affidavit similarly asserts Plaintiff "was subject to pure harassment by **Sharon Fothergill and Stephanie Vo** sending me harassment letters that are nothing but product of fiction because [of] retaliatory motives." PSMF ¶ 56 (emphasis in original).

Plaintiff also testified that he believed the non-renewal of his lease directly resulted from filing the Lawsuit. *Id.* at 94. When asked if he had any evidence Defendants retaliated against Plaintiff by choosing to not renew his lease, Plaintiff responded "the evidence is there." *Id.* When asked to explain the causal link between the Lawsuit and the nonrenewal of his lease, Plaintiff similarly testified that "[t]he link is exactly what it is. The link is retaliation. Retaliation is the link. You, you took us to court. You sued us. We're going to throw out – We're going to throw you out of our building. Simple as that." *Id.* at 95-96. Plaintiff also observed his lease was renewed several times prior to filing the Lawsuit. *Id.* at 96; PSMF ¶ 11 (same). Regarding other potential motives for the non-renewal of his lease, Plaintiff suggested "[t]he only incident that could have triggered a motive for the, the non-renewal of my lease was also retaliatory because I had called the police

on the property manager, Sharon . . . Fothergill, because I had asked her to cease that siren that was aggravating . . . my brain injury." *Id.* at 94.

## II. LEGAL STANDARD

A party may obtain summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is genuine if "a reasonable trier of fact could return judgment for the non-moving party." *Miccosukee Tribe of Indians of Fla. v. United States*, 516 F.3d 1235, 1243 (11th Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)). A fact is material if it "might affect the outcome of the suit under the governing law." *Id.* (quoting *Anderson*, 477 U.S. at 247-48). The Court views the facts in the light most favorable to the non-moving party and draws all reasonable inferences in the non-moving party's favor. *See Davis v. Williams*, 451 F.3d 759, 763 (11th Cir. 2006). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which a jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. Further, the Court does not weigh conflicting evidence. *See Skop v. City of Atlanta, Ga.*, 485 F.3d 1130, 1140 (11th Cir. 2007) (quoting *Carlin Comm'n, Inc. v. S. Bell Tel. & Tel. Co.*, 802 F.2d 1352, 1356 (11th Cir. 1986)).

The moving party shoulders the initial burden of showing the absence of a genuine issue of material fact. *Shiver v. Chertoff*, 549 F.3d 1342, 1343 (11th Cir. 2008). Once this burden is satisfied, "the nonmoving party 'must do more than simply show that there is some metaphysical doubt as to the material facts.'" *Ray v. Equifax Info. Servs., L.L.C.*, 327 F. App'x 819, 825 (11th Cir. 2009) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)). Instead, "the non-moving party 'must make a sufficient showing on each essential element of the case for which he has the burden of proof.'" *Id.* (quoting

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). Accordingly, the non-moving party must produce evidence, going beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designating specific facts to suggest that a reasonable jury could find in the non-moving party's favor. *Shiver*, 549 F.3d at 1343. Even "where the parties agree on the basic facts but disagree about the factual inferences that should be drawn from those facts," summary judgment may be inappropriate. *Warrior Tombigbee Transp. Co., Inc. v. M/V Nan Fung*, 695 F.2d 1294, 1296 (11th Cir. 1983).

## III. DISCUSSION

Defendants' Motion contends the record is devoid of evidence establishing a causal connection between Plaintiff's Lawsuit and Defendants' subsequent non-renewal of Plaintiff's lease. In the absence of such evidence, Defendants argue Plaintiff's retaliation claim fails as a matter of law. Plaintiff argues he is entitled to judgment as a matter of law because the record establishes Defendants retaliated against him by deciding not to renew his lease after he filed the Lawsuit.

The Fair Housing Act ("FHA") provides "[i]t shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed . . . any right granted or protected by section 3603, 3604, 3605, or 3606 of this title." 42 U.S.C. § 3617. To prevail on an FHA retaliation claim, "a plaintiff must submit evidence that (1) she engaged in a protected activity, (2) the defendant committed an adverse act against her, and (3) there is a causal link between the protected activity and the adverse action." *McCall v. Montgomery Hous. Auth.*, No. 19-14870, 2022 WL 683081, at *3 (11th Cir. Mar. 8, 2022) (citing *Dixon v. Hallmark Cos., Inc.*, 627 F.3d 849, 858 (11th Cir. 2010)). "Where, as here, a plaintiff claims discrimination or retaliation based on circumstantial evidence, we ordinarily

apply the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)."[4] *Owens v. State of Ga., Governor's Off. of Student Achievement*, 52 F.4th 1327, 1334 (11th Cir. 2022) (citing *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1264 (11th Cir. 2010)); *see also Sec'y, U.S. Dep't of Hous. & Urban Dev., on Behalf of Herron v. Blackwell*, 908 F.2d 864, 870 (11th Cir. 1990) (holding *McDonnell-Douglas'* burden-shifting framework applies to FHA discrimination claims). The *McDonnell-Douglas* framework articulates a three-step inquiry:

> the plaintiff bears the initial burden of establishing a prima facie case. If the plaintiff satisfies this burden, the burden of production then shifts to her employer to articulate a legitimate, nondiscriminatory reason for its actions. If the employer proffers even one such reason, the burden then shifts back to the plaintiff, who must show that the reason given by the employer was a mere pretext for discrimination.

*Owens*, 52 F.4th at 1338 (citations omitted). "Importantly, throughout this entire process, the ultimate burden of persuasion remains on the employee." *Sims v. MVM, Inc.*, 704 F.3d 1327, 1333 (11th Cir. 2013).

To meet his burden, Plaintiff accordingly must demonstrate (1) he engaged in a protected activity, (2) Defendants committed an adverse action against him, and (3) "there is a causal link between the protected activity and the adverse action." *McCall*, 2022 WL 683081, at *3. Plaintiff argues his Lawsuit is a protected activity, and Defendants' non-renewal of his lease constitutes an adverse action. Regarding causation, Plaintiff contends the temporal proximity between his

---

[4] The Eleventh Circuit has assumed without deciding that the *McDonnell-Douglas* burden-shifting framework applies to FHA retaliation claims. *See, e.g.*, *Philippeaux v. Apartment Inv. & Mgmt. Co.*, 598 F. App'x 640, 644 (11th Cir. 2015) ("To establish a prima facie case of [FHA] retaliation, a plaintiff must show that (1) he engaged in a protected activity; (2) the defendant subjected him to an adverse action; and (3) a causal link exists between the protected activity and the adverse action." (quoting *Walker v. City of Lakewood*, 272 F.3d 1114, 1128 (9th Cir. 2001)). The Eleventh Circuit noted approvingly that *Walker* applied "the legal framework used in Title VII cases to an FHA retaliation case." *Id.* The Parties do not dispute that *McDonnell-Douglas* applies in this case. The Court accordingly relies on this burden-shifting framework—as well as non-FHA cases articulating its parameters—to analyze Plaintiff's retaliation claim.

Lawsuit and the non-renewal establishes a causal link between the two. Defendants do not dispute that the Lawsuit is a protected activity, or that the non-renewal of Plaintiff's lease constitutes an adverse action. Defendants argue that there is no evidence establishing a causal link between the two, however, and that the temporal proximity between the two events is insufficient as a matter of law.

## A. FHA Retaliation

The Eleventh Circuit "construe[s] the causal link element broadly so that 'a plaintiff merely has to prove that the protected activity and the . . . [adverse] action are not completely unrelated.'" *Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir. 2004) (quoting *Olmsted v. Taco Bell Corp.*, 141 F.3d 1457, 1460 (11th Cir. 1998)). "A 'close temporal proximity' between the protected expression and an adverse action is sufficient circumstantial evidence of a causal connection for purposes of a prima facie case." *Id.* (citing *Olmsted,* 141 F.3d at 1460). "Mere temporal proximity, without more, however, must be 'very close.'" *Jackson v. Agency for Persons with Disabilities Fla.*, 608 F. App'x 740 (11th Cir. 2015) (quoting *Thomas v. Cooper Lighting, Inc.,* 506 F.3d 1361, 1364 (11th Cir.2007)). "[A] period as much as one month between the protected expression and the adverse action is not too protracted." *Higdon,* 393 F.3d at 1220. However, "'[a] three to four month disparity between the statutorily protected expression and the adverse employment action is not enough' to support an inference of causation." *Jackson*, 608 Fed. App'x 740 (citing *Thomas,* 506 F.3d at 1364) (alterations accepted)).

### i. Plaintiff's *Prima Facie* Case

Defendants contend they are entitled to summary judgment because "there is zero evidence of a causal link between [Plaintiff] filing the Lawsuit" and Defendants' non-renewal of Plaintiff's lease. ECF No. [58-1] at 5. Defendants argue the undisputed evidence establishes the reason for

the non-renewal of Plaintiff's lease is Plaintiff's "perceived behavior toward Fothergill and complaints from other tenants," which are memorialized in the Letters. *Id.* at 5-6. Defendants contend Plaintiff lacks evidence supporting the inference that the non-renewal of Plaintiff's lease was an act of retaliation for filing the Lawsuit. In the absence of any such evidence, Defendants argue Plaintiff's reliance on the temporal proximity between the Lawsuit and non-renewal fails as a matter of law, and that Plaintiff accordingly fails to make out a *prima facie* case of retaliation under the FHA.

Plaintiff argues Defendants retaliated against him "because he took steps to support his lawful rights under the Federal Civil Rights statutes that prohibit Landlords from discriminating against Tenants in the terms of conditions of housing because of his active . . . pursuit of his protected activities[.]" ECF No. [59] at 6. Plaintiff contends the fact Defendants declined to renew his lease after he filed his Lawsuit establishes a sufficient causal link between his protected activity—the Lawsuit—and Defendants' adverse action—deciding not to renew Plaintiff's lease.

Plaintiff also filed several exhibits to support his Motion. *See generally* ECF No. [61]. Those exhibits consist of the five Monarc lease agreements between Plaintiff and Defendant Miami Apartments Investors, LLC, ECF Nos. [61-1] – [61-5]; a lease agreement between Plaintiff and a previous apartment complex in Los Angeles, California, ECF No. [61-6]; the Notice of Non-Renewal, ECF No. [61-7]; Plaintiff's timeline of relevant events in this case, ECF No. [61-8]; a document reflecting a one-month rent concession Monarc offered Plaintiff for September 2019, ECF No. [61-9]; a housing discrimination complaint Plaintiff filed with the United States Department of Housing and Urban Development (dated June 24, 2019), ECF No. [61-10]; a housing discrimination complaint Plaintiff filed with the United States Department of Justice, Civil Rights Division and Urban Development (dated June 1, 2021), ECF No. [61-11]; and a Notice of

Determination of No Cause from the Florida Commission on Human Rights (dated October 9, 2020), ECF No. [61-12]. Except for Plaintiff's timeline of events, however, those exhibits are largely irrelevant to Plaintiff's retaliation claim.

First, it is undisputed Plaintiff lived at Monarc for five years before the non-renewal of his lease. DSMF ¶ 1; PSMF ¶ 7. Second, Plaintiff's complaints filed with the United States Department of Housing and the Department of Justice, Civil Rights Division, ECF Nos. [61-10], [61-11], and the Notice of Determination of No Cause, ECF No. [61-12], pre-date the Lawsuit. Those documents therefore cannot show Defendants retailed against Plaintiff for filing the Lawsuit, nor do they support a finding that Defendants' reason for issuing the Notice of Non-Renewal is pretextual. To the contrary, the Notice of Determination of No Cause found in part "there is not reasonable cause to believe that a discriminatory housing practice occurred in violation of Section § 760.37, Florida Statutes[,]" which prohibits retaliation.[5] ECF No. [61-12] at 8. Consistent with the Lawsuit, those documents simply demonstrate Plaintiff accused Defendants of disability discrimination for failing to provide Plaintiff with a requested parking space and adequate parking garage access.

Regarding Plaintiff's timeline of events, ECF No. [61-8], Plaintiff relies on the temporal proximity between the Lawsuit and the Notice of Non-Renewal. Although he acknowledges a temporal proximity must be very close to support an inference of causation, Plaintiff nonetheless contends that is the case here. According to Plaintiff, the following timeline of events demonstrates Defendants' non-renewal of his lease was based on Plaintiff's decision to file the Lawsuit:

1) August 16, 2021: Plaintiff files the Lawsuit

2) November 1, 2021: Defendants send the First Letter to Plaintiff

---

[5] The Determination of No Cause also found no reasonable cause to believe a discriminatory housing practice occurred with respect to Plaintiff's related disability discrimination claims. *See generally* ECF No. [61-12].

3)  March 1, 2022: Defendants send the Second Letter to Plaintiff

4)  May 16, 2022: Plaintiff files his appeal of the dismissal of the Lawsuit

5)  August 3, 2022: Defendants send the Notice of Non-Renewal to Plaintiff

6)  April 3, 2023: Plaintiff files this case

As a threshold matter, the dates on which Plaintiff filed his appeal and filed this case are not pertinent to the Court's causation analysis as they have no bearing on whether there is a link between Plaintiff's protected activity and the adverse action taken by Defendants. To make out a *prima facie* case of FHA retaliation, Plaintiff instead must establish a sufficient causal link between Plaintiff's protected activity of filing the Lawsuit and Defendants' adverse actions—the Notice of Non-Renewal. If Plaintiff fails to make this showing, his retaliation claim fails as a matter of law. *McCall*, 2022 WL 683081, at *3.

### 1. Non-Renewal of Plaintiff's Lease

Plaintiff primarily relies on the temporal proximity between the Lawsuit and the Notice of Non-Renewal to establish a causal link between the two events. As detailed above, Plaintiff filed the Lawsuit on August 16, 2021. *Philippeaux*, Case No. 21-cv-22981-PCH, ECF No. [1]. Defendants sent Plaintiff the Notice of Non-Renewal on August 3, 2022. ECF No. [58-8]. Plaintiff thus relies on the approximately one-year period between the Lawsuit and Notice of Non-Renewal to establish a link between the two. Defendants respond that a one-year period between a protected activity and adverse action is insufficient under controlling precedent.

Plaintiff lacks support for his position that the roughly one-year period between the Lawsuit and Notice of Non-Renewal establishes a sufficient causal link between the two events. To the contrary, the authorities on which Plaintiff relies support Defendants' position that this causal link is insufficient as a matter of law. As the Eleventh Circuit explained in *Higdon*, "[t]he Supreme

Court has stated that 'mere temporal proximity between . . . knowledge of protected activity and an adverse . . . action . . . must be "very close."'" *Higdon*, 393 F.2d at 1220 (quoting *Clark County Sch. Dist. v. Breeden,* 532 U.S. 268, 273, 121 S.Ct. 1508, 1511, 149 L.Ed.2d 509 (2001) (citations omitted)). The Supreme Court also "cited with approval decisions in which a three to four month disparity was found to be insufficient to show causal connection." *Id.* (citing *Clark County Sch. Dist.*, 523 U.S. at 273 (citations omitted)). Consistent with *Clark County*, the Eleventh Circuit has found "[i]f there is a substantial delay between the protected expression and the adverse action in the absence of other evidence tending to show causation, the complaint of retaliation fails as a matter of law." *Id.*

*Higdon* applied this guidance to the plaintiff's retaliation claim and accordingly found that "[b]y itself, the three-month period between the September 29 letter and the December 31 incident does not allow a reasonable inference of a causal relation between the protected expression and the adverse action." *Id.* at 1221 (citing *Clark County Sch. Dist.*, 532 U.S. at 273)). The Eleventh Circuit has since held that "'[a] three to four month disparity between the statutorily protected expression and the adverse employment action is not enough' to support an inference of causation." *Jackson*, 608 Fed. App'x 740 (citing *Thomas*, 506 F.3d at 1364) (alterations accepted)).

Accordingly, while Plaintiff is correct that "[t]he causal link element is construed broadly so that 'a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated[,]'" *Pennington v. City of Huntsville*, 261 F.3d 1262 (11th Cir. 2001) (quoting *Olmstead*, 141 F.3d at 1460), Plaintiff's reliance on the roughly year-long period between his Lawsuit and the Notice of Non-Renewal fails to make this showing under controlling

precedent.[6] Plaintiff accordingly fails to make out a *prima facie* retaliation claim based on the temporal proximity between the Lawsuit and the Notice of Non-Renewal.

### 2. Defendants' Letters

Plaintiff does not argue the Letters constitute adverse actions. Instead, Plaintiff argues the Letters are pretextual and fail to rebut his *prima facie* retaliation claim. Plaintiff relies on the Letters to form his timeline of events, however. Further, Plaintiff's deposition testimony makes clear he believes the Letters were "manufactured" in order to retaliate against Plaintiff for filing the Lawsuit. *See* ECF No. [67] at 90-92; *see also* PSMF ¶ 12 ("The Defendants appear to [have] construct[ed] letters to create a defense against Mr. Philippeaux's lawsuit."). The Court therefore considers whether the Letters establish a sufficient link between Plaintiff's Lawsuit and Defendants' decision to not renew Plaintiff's lease. The roughly two-and-one-half month period between the Lawsuit and November Letter is close enough in time to plausibly serve as a link between Plaintiff's Lawsuit and Defendants' adverse actions, namely, sending the Letters and subsequently declining to renew Plaintiff's lease. The temporal proximity between the Lawsuit, First and Second Letters, and Notice of Non-Renewal is nonetheless quite attenuated, with periods of several months elapsing between each adverse action. However, Defendants do not dispute that they were aware of the Lawsuit when they sent Plaintiff the Letters and subsequent Notice of Non-Renewal.

---

[6] Plaintiff's reliance on *Shannon v. Bellsouth Telecommunications, Inc.*, 292 F.3d 712, 716-17 (11th Cir. 2002) to argue that a plaintiff may establish a causal connection by showing that "'the decision-makers were aware of the protected conduct, and that the protected activity and the adverse actions were not wholly unrelated[]'" is unpersuasive for the same reasons. *Id.* (quoting *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 590 (11th Cir. 2000)).

The Court finds that Plaintiff's reliance on the Letters is sufficient to support the inference that the Lawsuit, Letters, and Notice of Non-Renewal "are not completely unrelated.'" *Higdon*, 393 F.3d at 1220 (internal quotation omitted). Plaintiff has thus presented a colorable *prima facie* retaliation claim, namely, that Defendants sent the Letters because Plaintiff filed the Lawsuit, and did so to establish sufficient pretext for the subsequent non-renewal of Plaintiff's lease. The burden thus shifts to Defendants "to articulate a legitimate, nondiscriminatory reason for its actions. If the [Defendants] proffer[] even one such reason, the burden then shifts back to the [P]laintiff, who must show that the reason given by the [Defendants] was a mere pretext for discrimination." *Owens*, 52 F.4th at 1338 (citations omitted)

### ii.  Defendants' Legitimate, Non-Discriminatory Reason

Defendants proffer a legitimate, nondiscriminatory reason for deciding not to renew Plaintiff's lease: Plaintiff's problematic behavior, as memorialized in the Letters. The Letters detail the complaints Defendants received from other residents regarding Plaintiff's behavior, as well as Plaintiff's perceived behavior toward Fothergill. *See* ECF Nos. [58-6], [58-7]. The Fothergill Declaration corroborates the complaints described in the Letters. *See* ECF No. [58-5] ¶¶ 11-12, 14-16. It also explains the Letters were sent based on those complaints as well as Fothergill's perception of Plaintiff's behavior toward her. *Id.* The record thus supports Defendants' contention that the decision not to renew Plaintiff's lease was based on his problematic behavior, not as retaliation for filing the Lawsuit. The burden accordingly shifts back to Plaintiff to demonstrate Defendants' legitimate reason for declining to renew his lease is pretextual.

### iii.  Whether Defendants' Proffered Reason is Pretextual

Because Defendants have provided legitimate, nondiscriminatory reasons for declining to renew Plaintiff's Lease, Plaintiff must now "meet the [defendants'] proffered reason head-on and

rebut it; the plaintiff cannot succeed by merely disputing the wisdom of the [defendant's] reason." *Wesley v. Austal USA, LLC*, 776 F. App'x 638, 644 (11th Cir. 2019). Plaintiff must show "*both* that the reason was false, *and* that discrimination was the real reason.*" St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993) (emphasis in original).

Plaintiff fails to make either showing. Plaintiff contends Defendants "manufactured" the Letters, and that Defendants "appear to [have] construct[ed] [the] letters to create a defense against [Plaintiff's] lawsuit." ECF No. [60] ¶ 12; PSMF ¶ 12. Defendants respond that Plaintiff's assertion that Defendants "fabricated" the Letters is contradicted by the record. As discussed, the Letters memorialize other residents' complaints about Plaintiff's behavior, as well as Fothergill's perception of Plaintiff's conduct toward her. ECF Nos. [58-6], [58-7].

The November Letter informed Plaintiff "[i]t has been noted that you have approached Ms. Fothergill on numerous occasions in a harassing, argumentative, and aggressive manner, including physically banging on the glass walls of the leasing office[]" and that Defendants "have received complaints from several residents that your presence at the Concierge desk is disruptive and intrusive." ECF No. [58-6]. The November Letter further "instructed [Plaintiff] to cease all communications with Ms. Fothergill and, instead, communicate only with Mr. Wellington Gomez of Residential Management[.]" *Id.* The March Letter explains "[s]ince our prior correspondence of November 2, 2021, [Defendants] have continued to receive complaints from several residents and our front desk staff concerning your prolonged presence and conduct at the Concierge." ECF No. [58-7]. The Fothergill Declaration corroborates those complaints. It also explains Fothergill requested the Letters be sent to Plaintiff to request he cease his disruptive behavior as well as any future contact with Fothergill. *See* ECF No. [58-5] ¶¶ 11-12, 14-16. For his part, Plaintiff provides no support for his position that the Letters are fake. To the contrary, Plaintiff's testified that there

"may have one or two persons who may have said something about, about me being in the lobby more frequently than [other residents] would like[.]" ECF No. [67] at 77-78. Plaintiff also recalled knocking on the glass door of the leasing office, although he does not recall making Fothergill uncomfortable when he did so. *See* ECF No. [67] at 46. Plaintiff's own deposition testimony thus partially corroborates the events memorialized in the Letters.

The record is thus devoid of evidence supporting Plaintiff's assertion that the Letters are fake or reveal an underlying retaliatory motive. Conversely, the record—including Plaintiff's deposition testimony—establishes that at least some of the complaints memorialized in the Letters occurred. Plaintiff's unsupported contention that Defendants fabricated the Letters therefore fails to show "that the reason was false," let alone "that discrimination was the real reason." *Hicks*, 509 U.S. at 515. According to Plaintiff, the pretext is shown because Defendants sent the Notice of Non-Renewal after Plaintiff filed the Lawsuit. As discussed, however, Plaintiff's reliance on the temporal proximity between the Lawsuit and Notice of Non-Renewal is insufficient as a matter of law. Plaintiff cannot establish the Letters and Notice of Non-Renewal are pretextual by simply pointing to the fact that the Lawsuit was filed before these events occurred. Plaintiff's conclusory deposition testimony similarly fails to establish pretext. *See, e.g.*, ECF No. [67] at 95 (Explaining "[t]he link [between his Lawsuit and non-renewal] is exactly what it is. The link is retaliation. Retaliation is the link.").

Plaintiff attempts to characterize his interactions with Fothergill as a basis to find retaliatory motives. Plaintiff testified an incident with Fothergill "could have triggered a motive for the . . . non-renewal of [his] lease" because Plaintiff once called the police on Fothergill after asking "her to cease that siren that was aggravating . . . my brain injury." ECF No. [67] at 94. However, Plaintiff fails to articulate how this interaction is a retaliatory reason for Defendants'

non-renewal of Plaintiff's lease. Moreover, the record is devoid of evidence suggesting that this particular incident—rather than the incidents detailed in the Letters and the Fothergill Declaration—is in any way related to the non-renewal of Plaintiff's lease.

Plaintiff also describes an incident where Fothergill apparently directed a co-worker to "**tell [Plaintiff] to get out of the leasing office right now**." PSMF ¶ 43 (emphasis in original). Fothergill may have been uncomfortable around Plaintiff. However, this incident fails to create a genuine dispute as to whether Defendants' decision not to renew Plaintiff's lease is pretextual. The record establishes Defendants decided not to renew Plaintiff's lease based in part on Fothergill's subjective beliefs regarding Plaintiff's behavior toward her. The November Letter explicitly instructed Plaintiff "to cease all communication with Ms. Fothergill and communicate only with Mr. Wellington Gomez[.]" ECF No. [58-6]. Even assuming the interaction between Plaintiff and Fothergill took place as described, that interaction is consistent with Fothergill's feelings toward Plaintiff. At best, it supports that Defendants declined to renew Plaintiff's lease in part because Plaintiff made Fothergill feel uncomfortable. Defendants do not dispute this; to the contrary, they explicitly argue Fothergill's perception of Plaintiff's conduct toward her was one of the reasons they declined to renew his lease. *See* ECF No. [58-1] at 5-6.

Moreover, deciding not to renew Plaintiff's lease based partially on Fothergill's subjective perception of Plaintiff's conduct is consistent with controlling precedent, even if Fothergill's perception is inaccurate. *Cf. Lopez v. AT&T Corp.*, 457 F. App'x 872, 874 (11th Cir. 2012) ("The inquiry into whether an employer's proffered reasons were merely pretextual centers on the employer's beliefs, not the beliefs of the employee or even objective reality."); *Hawkins v. Ceco Corp.,* 883 F.2d 977, 980 n. 2 (11th Cir. 1991) ("A lack of concern about the accuracy of a decision will not establish pretext as a matter of law."). Whether Fothergill's perception of Plaintiff's

behavior is accurate is not relevant to the Court's analysis. This is particularly true where there is no additional evidence supporting Plaintiff's claim that Defendants reason for not renewing Plaintiff's lease is pretextual.

Plaintiff has accordingly failed to meet his burden to "demonstrate 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the [defendants'] proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence.'" *Combs v. Plantation Patterns, Meadowcraft, Inc.*, 106 F.3d 1519, 1538 (11th Cir. 1997) (citing *Sheridan v. E.I. DuPont de Nemours & Co.*, 100 F.3d 1061, 1072 (3d Cir. 1996)). Plaintiff's characterization of the events leading to his non-renewal is instead largely consistent with Defendants' version of events. Conversely, Defendants have demonstrated that Plaintiff's unsupported assertions fail to rebut their nondiscriminatory reason for declining to renew Plaintiff's lease. Defendants have thus demonstrated that the undisputed evidence entitles them to summary judgment on Plaintiff's FHA retaliation claim.

## B. Plaintiff's Complaints Regarding Discovery

While not relevant to the Court's analysis on summary judgment, Plaintiff also contends Defendants failed to meaningfully participate in discovery or in the mediation held in this case. Defendants respond by accurately observing that Plaintiff's assertions regarding their conduct during discovery have no bearing on whether the Parties have met their respective burdens at this stage in the proceedings. To the extent Plaintiff is arguing Defendants should be subject to discovery sanctions, the Court disagrees. As the Eleventh Circuit explained in *McCall*, discovery sanctions are predicated on a finding that a party flagrantly disregarded the Court's discovery orders:

> The federal rules of civil procedure allow a litigant to move to compel discovery. Fed. R. Civ. P. 37(a)(3)(A) ("If a party fails to make a disclosure required by Rule

26(a), any other party may move to compel disclosure and for appropriate sanctions."). If the district court grants a motion to compel and orders a litigant to comply, and he refuses, then the district court may enter sanctions for violating a court order. *Id.* R. 37(b) ("If a party ... fails to obey an order to provide or permit discovery ... the court where the action is pending may issue further just orders."). Other than initial disclosures—which are required without a request from the opposing party, *see id.* R. 26(a)(1)—"[w]e consistently have found [r]ule 37 sanctions ... to be appropriate, however, only 'where the party's conduct amounts to flagrant disregard ... *of discovery orders.*'" *United States v. Certain Real Property Located at Route 1, Bryant, Ala.*, 126 F.3d 1314, 1317 (11th Cir. 1997) (quoting *Buchanan v. Bowman*, 820 F.2d 359, 361 (11th Cir. 1987)).

2022 WL 683081, at *2. Here, Plaintiff filed a motion to compel on January 2, 2024, which was denied by Chief Magistrate Judge Torres "due to its non-compliance with the Court's standing discovery order." ECF No. [53]. Plaintiff made no further attempts to compel additional discovery from Defendants. Accordingly, the Court "never entered—and thus the defendants never violated—an order requiring the defendants to provide" additional documents. *McCall*, 2022 WL 683081, at *3. Plaintiff's assertions regarding Defendants' conduct during discovery thus provide no basis for Rule 37 sanctions, let alone a basis for denying Defendants' Motion.

## IV. CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** as follows:

1. Defendants' Motion for Summary Judgment, **ECF No. [58]**, is **GRANTED**.

2. Plaintiff's Motion for Summary Judgment, **ECF No. [59]**, is **DENIED**.

3. Final Judgment shall be entered by separate order.

**DONE AND ORDERED** in Chambers at Miami, Florida, on May 3, 2024.

**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

Case No. 23-cv-21275-BLOOM/Torres

Copies to: Counsel of Record